UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WORCESTER DISTRICT COURT

U.S.CIVIL NUMBER_____

JOSE LUIS CABRERA
(PETITIONER)

    V.

STEVEN O'BRIEN
(RESPONDENT)

PETITIONER WRIT OF HABEAS CORPUS
MEMORANDUM ,PURSUANT TO 28 U.S.C.¦2254,BY PERSON
IN STATE CUSTODY:

The pro-se petitioner Jose Luis Cabrera is a Massachusetts State prisoner currently incarcerated under conviction of Massachusetts General Law indictment of Essex County no.1999-01557,code of offense murder G.L.c.265¦1,Guilty verdict(lesser offense in the second degree G.L.c.265¦2.,and is currently incarcerated in the care and custody of the Massachusetts Department of Correction at State prison,N.C.C.I. Gardner ,500 Colony Rd. Gardner Mass.01440.

The respondent is Steven O'Brien superintendent of DOC N.C.C.I.Gardner State prison,at 500 Colony Rd,Gardner Mass.01440.

The pro-se petitioner Jose Luis Cabrera present his application petition under 28 U.S.C.¦ 2254 for Writ of Habeas Corpus Unlawfuly Confinement ,Based on violation of the Federal Constitution 5th  and 14th Amendment of the United States Constitution and his life sentence must be vacated or set aside 28 U.S.C.¦2255;

**PRIOR PROCEEDING INDICTMENT WHEN GRAND JURY WAS SITTING:**

## STATEMENT OF THE CASE

On July 28 1999,an indictment was returned charging Jose luis Cabrera with the murder of Nelson Liriano nine years [C.A.6.   8]. The defendant plead not guilty on August 10/1999. [C.A.6]. see note A/.

The defendant's motion to supress statements was heard on October 11-12,2000,and was denied.[C.A.2].

Trial commenced on February 5/2001 in Newburyport,Welch J.presiding.[C.A.5].

On February 12/2001,the defendant's motion for required finding of not guilty at the close of the Commonwealth's case was denied.[C.A.3-4,10].

The defendant's motion for a required find of not guilty at the close of all the evidence was denied on February 14/2001. [C.A.4,10].

On February 15/2001,the defendant was convicted of murder in the second degree and was sentenced to M.C.I.Cedar Junction for life[C.A.4,12].

A notice of appeal was filed on February 26/2001.[C.A.4,13].

Appeal was denied on March 3/2005,Commonwealth V.Cabrera A.C.No.03-P-24.Judgment affirmed denying motion to set aside verdict affirmed.[C.A.14].

Application for further appellate review denied,on April 27/2005,FAR No.-14723 [C.A.15].

---

Note A/. C.represents last name of petitioner  Cabrera (C.)A. represents appendix exhibit's in support number is the page number's of documents of exhibit cited, Exh-1 thru 8).

Tr. represents trial tanscripts volume and pages cited (Tr. volume/ page          ).Exhibit's  A thru H).

## STATEMENT OF FACTS

### INTRODUCTION

An argument between two friends at a late night drinking party allegedly resulted, during a heated few minutes, in the tragic death of Nelson Liriano. Jose Luis Cabrera was convicted of second degree murder in connection with that death.

The prosecution's key civilian witnesses against Cabrera were the party's host, a regular proprietor of an illegal "after hours" business (Maria Rivera), her aunt (Leonarda Pasuy), the live-in boyfriend (Victor Mercado) of victim Liriano's former girlfriend, and a business associate of Mercado (Victor Reyes) who was not at the party. None of these witnesses initially volunteered information to the police or other investigators, and those who were at Maria's party all fled the scene. [Tr. 2/248-249; 3/40-43; 4/236-38; 5/43, 162-163, 226-227]. Nearly ten years later, these same individuals testified as eyewitnesses to verbal and physical altercations between the deceased, Nelson Liriano, and the accused, Jose Luis Cabrera. Several witnesses' 1999 trial testimony included statements which were either absent from or inconsistent with their signed 1990 statements. [Tr. 2/253-262, 276,

( 3 )

282-83; 3/14-15, 17-27, 49, 63, 96; 5/32, 34, 79-80, 102]. It was based upon this collection of disparate stories that Jose Luis Cabrera was convicted of second degree murder. [Tr. 8/16].

**FACTS**

In the early hours of May 11, 1990, Nelson Liriano died after being stabbed during a late night party in Lynn, Massachusetts, which was hosted by Maria Rivera.[1]   Rivera ran an "after hours" business[2] from the apartment where she and her three young children lived. [Tr. 2/2/173-174, 205; 5/165, 174]. Rivera claimed that the party that she held on May 11, 1991 was not related to her "after hours" business, and that no alcohol was sold at the private gathering. [Tr. 2/206, 288-290].[3]   The party began around 2:00 AM,

---

[1]  Rivera testified in English although her primary language was Spanish. [Tr. 2/171]. At one point, she testified that she though the word, "inaccuracies," meant "better." [Tr. 3/77]. The prosecutor assisted Rivera in clearing up a five year old arrest warrant and assured her that she would not be held in custody. [Tr. 3/12-14].

[2]  Rivera's "after hours" business earned her $200 to $300 a night selling beer to late-night club-goers who wanted to continue to party and socialize after the local night clubs had closed. [Tr. 2/205, 272]. Food, drinks, and drugs were often sold at these parties. [Tr. 6/36-37]. Rivera claimed not to know that such "after hours" parties were illegal. [Tr. 2/266].

[3]  Notwithstanding, some attendees were unsure whether drinks were being sold [Tr. 4/253; 5/173], and others said there was a three dollar charge per drink, which

after the ECO and Casa Del Sol night clubs had closed
for the evening. [Tr. 2/204; 6/40].

From the early evening of May 10, 1990, until
about 2:00 AM on May 11, 1990, Cabrera, Liriano, and
most of the prosecution's civilian witnesses were out
drinking and dancing at the ECO and/or Casa Del Sol
night clubs in Lynn, Massachusetts. [Tr. 2/203-4;
4/212, 214, 250-51; 5/10, 172; 6/40-41]. Cabrera had
had five beers at the clubs. [Tr. 6/39, 44]. As these
clubs closed, around 2:00 AM, these individuals and
many other people made their way to Rivera's apartment
for a party, where they continued to drink and dance.
[Tr. 2/204, 207-210]. The police were called to
Rivera's apartment shortly after 2:00 AM to shut down
the party due to a neighbor's complaint that the party
was too loud.[4] [Tr. 4/150, 178]. Although the police

_____

was paid directly to Rivera. [Tr. 6/50].
[4] Rivera could not recall whether the police did
anything during this "two-something" o'clock visit to
her house and indicated that she may have lied to the
police. [Tr. 2/211, 276-277, 280]. Rivera initially
recalled that during a subsequent 3:00 AM visit by
police, they entered her home and told everyone to go
home. [Tr. 2/212]. Contrary to Rivera's testimony, no
police cars were dispatched to Rivera's house between
2:10 AM and 4:46 AM that night. [Tr. 4/150]. According
to police records, there were three visits by police,
the first of which was in response to a call about a
loud party, placed at 2:10 AM. [Tr. 4/150, 178].
Officers arrived at Rivera's at 2:14 AM, spoke to
Rivera, told her to break up the party, and left at

ordered Rivera to get everyone to leave, the party continued. [Tr. 2/212; 6/47]. Cabrera had three beers there, for a total of eight beers that evening. He was buzzed and happy. [Tr. 6/48-49].

Sometime after 3:00 or 4:00 AM, Liriano began to argue with his friend, Cabrera, while sitting in Rivera's kitchen. [Tr. 2/221, 287; 4/221-223; 6/34, 42, 82]. Liriano's conversations with Cabrera had been friendly all evening,[5] but as Liriano drank hard liquor at Rivera's party,[6] he became very upset. [Tr. 6/42]. According to Cabrera, Liriano thought Cabrera had

---

2:33 AM. [Tr. 4/150]. The second call made by Victor Mercado regarding a stabbing, and was received by police at 4:46 AM. [Tr. 4/150, 236]. A police cruiser arrived at Rivera's at 4:49 AM, and finding no one at the residence and no evidence of a stabbing outside the apartment, left the premises at 5:05 AM [Tr. 4/151, 194]. The third call, from Mann, a civilian who had found Liriano's body while looking for cans [Tr. 4/153, 195], was logged as a fatal stabbing call and was taken by police at 5:50 AM [Tr. 4/150, 195]. A car arrived at Rivera's at 5:56 AM, and left the scene at 6:05 AM, after locating Liriano's body in a yard several houses from the party. [Tr. 4/153, 160].

[5] However, Liriano had confided to Mercado prior to arriving at Rivera's home that he was mad at Cabrera. [Tr. 5/9-12, 19-22].

[6] Rivera testified that Liriano was drunk and that Cabrera was not that drunk. [Tr. 2/217, 219-220]. Pasuy testified that Liriano was drunk and Cabrera was not drunk. [Tr. 5/185-186]. Mercado confirmed that Liriano was drinking liquor at the party and was drunk prior to the party. [Tr. 4/251; 5/15-16, 50]. The coroner determined a blood alcohol level of .08 [Tr. 4/104]. According to Cabrera's testimony, no one could stand Liriano when he was drunk. [Tr. 7/23].

(6)

introduced Liriano's wife, Brenda Beal, to Victor
Mercado, a rival suitor and an acquaintance of
Cabrera.[7] [Tr. 6/42, 43, 53-55; 7/27]. Beal was
romantically involved with Mercado, and lived with him
on May 11, 1990.[8] [Tr. 4/213]. During this argument,
Liriano called Cabrera a "cone mielda." [Tr. 2/254,
258; 3/14-15; 6/54].[9] Cabrera assured Liriano that he
did not introduce Beal to Mercado. [Tr. 6/55].

Cabrera testified that he left the kitchen and
walked away from Liriano into the living room at the
front of the apartment in order to end the
conversation. He sat down on the couch and began
talking with Luis Ozuma. [Tr. 6/55-57].[10] Liriano came

---

[7] Other witnesses who claimed to have heard this
initial argument stated that Liriano was upset because
Cabrera owed him $1,600. [Tr. 4/222-223; 5/21, 144-
145]. There was no testamentary or documentary evidence
to show that Cabrera actually owed Liriano any money.
[Tr. 7/28-29].

[8] Mercado boasted that he used to bring his friends
over to "do her" (Beal). [Tr. 4/264] He went to Beal's
apartment after the stabbing, even though Liriano had
spent the previous two nights there. [Tr. 4/238, 262;
5/45].

[9] Rivera testified that, "cone mielda" is Spanish for
"eat shit." [Tr. 2/227]. Both Rivera and Cabrera
indicated that Liriano said "cone mielda" to Cabrera.
[Tr. 3/15; 6/68]. Pasuy and Mercado did not recall
hearing Liriano use this term. [Tr. 5/16, 183].

[10] Pasuy at points indicated that Liriano went first to
the living room. [Tr. 5/146, 192]. However, she
acknowledged her signed 1990 statement to police,
indicated that in fact Cabrera was the first to enter
the living room, and that Liriano followed Cabrera.

into the living room five minutes later, and said to Cabrera, "Mielda, why do you leave me hanging over in the kitchen?" [Tr. 6/57]. When Cabrera told Liriano that he didn't want any trouble, Liriano kicked Cabrera in the left leg and threw a drink in his face. [Tr. 6/58]. Victor Mercado was standing nearby at the time, and according to Cabrera's testimony, when Cabrera stood up,[11] Mercado grabbed him and threw him against a shelf with "bottles and pretty things" on it. [Tr. 2/271, 6/59]. Cabrera testified that Liriano pushed him against the shelf, which collapsed.[12] [Tr. 6/60]. Liriano then grabbed Cabrera by the throat and shirt, at which point Cabrera began to defend himself. [Tr. 6/61]. The two men then fell to the ground [Tr. 3/30-32; 5/148]. Cabrera testified that Liriano grabbed a piece of broken glass[13] from the floor as

[Tr. 5/193].

[11] Cabrera was afraid of Liriano, and stood up so that Liriano would not hit him again. [Tr. 7/24]. At that time, Cabrera was "skinny and short," weighing around 125 pounds. [Tr. 7/24].

[12] There was conflicting testimony as to how broken glass got on the floor. Pasuy said that Cabrera threw a broken figurine at Liriano. [Tr. 5/149]. Mercado testified that Cabrera threw a bottle at Liriano which did not strike him. [Tr. 4/225-226; 5/54].

[13] Rivera testified that both men threw punches. [Tr. 2/229-230]. Witnesses also testified at trial, in 1999, that Liriano's hands were up during the altercation, but none of those witnesses mentioned this defensive

they both stood up, and Cabrera said again to Liriano
that he didn't want any problems. [Tr. 6/62]. Liriano
hit Cabrera, and Cabrera hit Liriano back. [Tr. 6/66].
Cabrera testified that Mercado and Ozuma had broken up
the fight. [14]    [Tr. 6/67; 7/7].

At this point, Cabrera testified that he went
into the kitchen, which was in the back of the
apartment, to get away from Liriano. [15]    [Tr. 6/66;

---

posture in their 1990 conversations with police. [Tr.
3/63, 93; 5/79-80, 5/102]. Additionally, Dr. Belliveau,
the coroner, testified that a wound on Liriano's arm
that he called a "defense" wound, "showed a double-
sharp edge," and he also confirmed that the kitchen
knife recovered after the altercation was *not* double-
edged. [Tr. 4/67, 118, 142]. Dr. Belliveau could *not*
draw a conclusion "as to whether Liriano was holding an
object in the hand of the arm that was not injured."
[Tr. 4/123]. Dr. Belliveau agreed that Liriano's injury
to his left arm could have occurred while Liriano threw
a punch and was struck by a sharp object. [Tr. 4/127].
Dr. Belliveau also said that the "superficial" cut
could have been caused by broken glass, and could
possibly have resulted from an offensive move by
Liriano. [Tr. 4/128]. Dr. Belliveau had not been told
by police that broken glass had been found at the
apartment. [Tr. 4/128].

[14] Pasuy testified that she was the only person to break
up the fight in the living room, specifically stating
that Rivera was not involved in stopping the fight [Tr.
5/150, 195-196]. Rivera, conversely, stated that she
too was involved in breaking up the fight. [Tr. 2/231,
233]. Mercado said that Pasuy, Rivera, and "[e]verybody
that was there tried to" break up the fight. [Tr.
4/227; 5/24, 27].

[15] Mercado testified that he saw Cabrera go into the
pantry [Tr. 4/229], and told police he saw Cabrera grab
the knife. [Tr. 5/32]. However, on cross examination,
Mercado admitted that he did not see Cabrera grab the
knife; he merely assumed it. [Tr. 5/34, 77-78]. Mercado
also mentioned that when he heard water running, he

7/51]. Several other witnesses admitted that Cabrera indeed was moving away from Liriano.[16]   [Tr. 3/23, 26; 5/25, 30].

Cabrera wanted to go out the back door, but the area was full of people. Cabrera heard someone yell that Liriano was coming after him and he became confused and panicked; his heart beating quickly. [Tr. 6/68, 70-71].

Liriano, with a piece of broken glass still in his left hand,[17] followed Cabrera into the kitchen,

---

assumed (but did not see) that Cabrera was washing off the knife. [Tr. 4/232].Mercado also admitted that he did not actually know what Cabrera did with the knife. [Tr. 4/233]. On cross-examination, Mercado admitted that he had falsely used his brother's name, Modesto, and had been charged in Springfield, Massachusetts using that name. He had been in default on that case. but someone in the district attorney's office did him a favor and the case — a drug distribution charge — was dropped. [Tr. 4/258-260, 5/6].

[16] Mercado testified that Cabrera moved away from Liriano. [Tr. 5/25]. Rather than staying in the living room or even retreating out the front door, Liriano instead went toward Cabrera in the kitchen. [Tr. 5/25]. Mercado testified that there was "no question" that Cabrera got away from Liriano, and that Liriano went toward Cabrera into the kitchen. [Tr. 4/230; 5/30]. Also, Rivera admitted that her testimony on direct examination was wrong when she said that Cabrera entered the dining room with a knife; and that it was actually Liriano who entered the kitchen and approached Cabrera at the refrigerator. [Tr. 2/243-244, 260; 3/22-23, 26]. She claimed that the stabbing occurred in the living room. [Tr. 3/96].

[17] Several witnesses, including Rivera and Mercado, testified that they did not see anything in Liriano's hands. [Tr. 2/242, 5/59].

where the two men struggled.[18]    [Tr. 5/25, 28, 57;
6/68-9]. Liriano swung at him and cut Cabrera's
finger. As he fell backwards during the struggle,
Cabrera grabbed a knife[19] from the kitchen table, and
the two men struggled. [Tr. 6/69, 74, 78; 7/49-50].
Cabrera was cut on his stomach during the struggle,
and Liriano also cut a finger on Cabrera's left hand.
[Tr. 6/69, 77; 7/49-50]. Eventually, the two men ended
up at the refrigerator, where, according to Cabrera's
testimony, Juan "Sami" Mejia grabbed Liriano and took
the glass from his hand, while Mercado grabbed Cabrera
and took the knife.[20]    [Tr. 6/79, 81; 7/36-38]. After
the two men were separated, Liriano argued for a few
more seconds. [Tr. 7/36]. At that point, Cabrera felt

---

[18] Rivera testified that Liriano approached Cabrera at
the refrigerator. [Tr. 3/22-26]. She further testified
that Cabrera hit Liriano's chest and/or stabbed him
several times, and that she did not see anything in
Liriano's hands. [Tr. 2/242, 244; 3/87]. Mercado
testified that Liriano was stabbed in the doorway of
the kitchen, but somehow was able to continue into the
kitchen and was stabbed at the refrigerator. [Tr. 5/36,
60]. Police found blood on the refrigerator door, on
the kitchen floor nearby, and the rear hallway. [Tr.
5/104, 111-112].
[19] According to Cabrera, the knife on the kitchen table
was being used to cut salami, which was part of the
food being sold at the party. [Tr. 7/16-17, 19]. Other
witnesses testified that soup was the only food served
at the party. [Tr. 2/217-218; 5/143, 181-82]. Rivera
claimed that the knife had been in the pantry. [2/237].
[20] Rivera testified that Cabrera put the knife in his
pants. [Tr. 2/245].

nothing. He stated that he did not know that Liriano was hurt, and he never saw blood on Liriano. [Tr. 6/80-81; 7/40]. He never intended to hurt or kill Liriano. [Tr. 6/82].

Mejia grabbed Liriano and took him out the back door, with Mercado following close behind. [Tr. 2/246; 6/81]. According to Cabrera's testimony, Mercado had the knife[21] in his hand at this point,[22] and Liriano was looking back at Cabrera as he was being pushed out by Mejia. [Tr. 7/36-38].

Cabrera remained in the front of the house (living room) for about five (5) minutes. [Tr. 7/11].[23] The men at the party told Cabrera that Liriano was coming back, so Cabrera left. [Tr. 6/81]. At that

---

[21] Rivera identified a kitchen knife found in a neighbor's yard as belonging to her. [3/57-60; 5/85]. That knife was consistent (along with other types of sharp instruments) with the type of instrument that could have caused the wounds. [Tr. 4/119]. No identifiable fingerprints were recovered from this knife. [Tr. 5/87, 90-91]. The knife did not test positive for blood. [Tr. 5/115].

[22] Mercado never testified to having the knife in his possession.

[23] Rivera testified that Mercado returned five minutes after leaving and told her to call an ambulance. [Tr. 2/262.] According to the coroner, Dr. Belliveau, the stab wounds sustained by Liriano would only allow him to live "seconds- or minutes" after he was fatally injured. [Tr. 4/80, 95, 137]. He testified that although Liriano might have been able to walk away from the incident site, he could not have traveled far. [Tr. 4/96-97].

point, Cabrera had not seen Liriano fall, nor had he seen him dead. [Tr. 7/9]. Cabrera's friend Pedro gave him a ride away from Rivera's apartment on May 11, 1990. [Tr. 7/7].

Shortly after the party, Cabrera moved to Waterbury, Connecticut,[24] and began using the alias of "Jose Antonio Gonzales." [Tr. 1/142]. He also used the alias, "Jose Vasquez." [Tr. 6/88]. Cabrera testified that he used an alias to avoid certain immigration issues which he believed could result in his being separated from his children.[25] [Tr. 6/90,

---

[24] Cabrera was arrested on a warrant in Connecticut on June 22, 1998. [Tr. 1/131]. Victor Reyes claimed that Cabrera had admitted killing someone in Lynn – a statement Cabrera denied. Reyes claimed that he told Cabrera to leave. Reyes testified that he drove Cabrera less than 100 feet to a bus station, and that Reyes saw Cabrera purchase a ticket, which he assumed was for a trip from Lynn to New York City. [Tr. 3/105, 111, 132, 137, 6/93]. Reyes, an unemployed restaurant worker, was convicted on February 24, 1995 of possessing and distributing marijuana and contributing to the delinquency of a minor and was sentenced to two years, three months committed with the balance suspended. Reyes was also convicted on November 7, 1994 for possessing and dispensing marijuana and received a two-year sentence, three months committed with the balance suspended. Additionally, Reyes was convicted on October 31, 1989 for possession with the intent to distribute heroin, for which he received a two-year suspended sentence. Reyes has utilized the alias of Victor Jose Jimenez. [Tr. 3/101, 140, 146; 5/235].

[25] Cabrera is married and has four (4) children, each of whom he has always supported. [Tr. 6/31-33]. The immigration issues arose from a conspiracy and narcotics sale charge in 1990 and being in the country illegally. [Tr. 6/32-33, 86]. He also had a 1996 drug

92; 7/33]. At no time did Cabrera deny using such an alias.[26]  [Tr. 1/155, 6/103; 7/32].

### SUMMARY OF THE ARGUMENT

The supplemental instruction on malice was so erroneous that it permitted the jury to convict the defendant of murder without taking into account the mitigating factors that negated malice. It also permitted the jury to believe that excessive force in self-defense justified a murder verdict. Furthermore, it shifted the burden of proof to the jury to prove that the killing was not excused or justified, rather than on the prosecution to prove the absence of those factors. [Pp. 15-22].

The judge erred in denying the defendant's Motion For A Required Finding Of Not Guilty because there was insufficient evidence of malice to send the case to the jury. [Pp. 22-33].

Defense counsel's repeated failings deprived the defendant of a fair trial. These failings included

---

conviction and an escape charge. [Tr. 6/86-89].

[26] During police questioning which was the subject of an unsuccessful motion to suppress, Cabrera admitted that he knew many people named Nelson and that he did not kill Liriano, but he knew who did. [Tr. 1/161-162]. He also viewed a photograph that he said looked like him but the upper lip was bigger. [Tr. 1/160].

failing to object to a consciousness of guilt instruction that permitted the jury to infer malice,failing to object to a burden shifting malice instruction and being insufficiently prepared for trial[Pp.33-40].

The prosecutor denied the defendant a fair trial as a result of his conduct during his closing argument when he argued facts not in evidence and unfairly inflamed the jury against the defendant[P.p.40-46].

The trial judge abused his discretion by refusing to permit defense counsel to inquire as to the defendant's knowledge of the victim's reputation where self-defense was at issue.[P.p.46-48].

ARGUMENT

I       THE TRIAL JUDGE PRECLUDED THE JURY FROM REACHING
        A VERDICT ON MANSLAUGHTER WHERE HIS SUPPLEMENTAL
        INSTRUCTION ON MALICE PERMITTED THE JURY TO CON-
        VICT THE DEFENDANT OF MURDER WITHOUT TAKING INTO
        ACCOUNT THE MITIGAING FACTORS OF SUDDEN COMBAT ,
        AND EXCESSIVE USE OF FORCE IN SELF-DEFENSE.

Prior  to commencing jury instructions ,the  trial judge  correctly  instructed the jury on malice  and   the Common-wealth's  burden  to prove  the  absence  of self-defense  and heat of combat.   [Tr.    7/158-163,167-168  ].

During the second day of deliberations,  the  jury returned  with  the following  questions;

> A)   May we have a definition of malice for
> the second degree charge?
>
> B)   May we have a definition of malice for
> the voluntary manslaughter charge?

[Tr. 8/9-10]. Clearly, the jury did not comprehend the difference between second degree murder and manslaughter. Defense counsel requested that the judge instruct the jury as to mitigating factors[27], arguing that "they relate directly to the application of malice when they're reaching their verdict. Those particular instructions cannot be divorced from the instructions with respect to malice." [Tr. 8/10]. The judge declined to so instruct the jury. Instead, with respect to the first questions, he instructed the jury as to the three prongs of malice for second degree murder. [Tr. 8/12-13]. He further instructed the jury that they "were permitted to infer that a person who intentionally uses a dangerous weapon is acting with malice." [Tr. 8/13]. He then concluded:

> Now ladies and gentlemen, as to your second
> question - I have defined to you what malice
> means for second degree murder. Your second
> question is may we have a definition of
> malice for voluntary manslaughter charge.
> Well, ladies and gentlemen, you can't
> because there is no such thing as malice for
> voluntary manslaughter. That is the

---

[27] Defense counsel specifically mentioned sudden combat and excessive use of force. [Tr. 8/11].

> difference between manslaughter and murder.
> Malice is not an element of voluntary
> manslaughter. Voluntary manslaughter is
> proven if you prove that there was an
> unlawful killing of Nelson Liriano by the
> defendant, that he intentionally killed
> Nelson Liriano, and that it was not excused
> or justified. You do **not** have to prove
> malice to prove voluntary **manslaughter**.

[Tr. 8/13-14]. The supplemental instruction was flawed on several levels. First, by giving a supplemental instruction which allowed the jury to infer malice from the use of the knife without explaining to the jury that malice can be negated by the presence of mitigating factors, it permitted the jury to find the defendant guilty of murder, regardless of whether they had a reasonable doubt as to whether the defendant acted without provocation. See Commonwealth v. Squailia, 429 Mass. 101, 109, 706 N.E.2d 636, 642 (1999) ("Voluntary manslaughter is an unlawful killing which occurs in circumstances which negate the element of malice"). Once elements of mitigating circumstances are adduced, the judge must properly instruct on manslaughter. Id. The supplemental instruction clearly failed to do so. Particularly in light of the trial judge's repetition of the instruction that malice could be inferred from the use of a dangerous weapon, the converse - that

malice was negated by the presence of mitigating factors – should have been included. The judge's supplemental instruction did not convey to the jury that manslaughter was an intentionally caused killing that arose from **either** sudden combat/reasonable provocation or from the excessive use of force in self-defense. Rather, it permitted the jury to convict the defendant of murder merely because he used a knife in circumstances that were consistent with a conviction of no more than manslaughter. See Commonwealth v. Ware, 553 Mass. App. Ct. 238, 243, 758 N.E.2d 638, 642 (2001) (Conviction reversed where instructions permitted jury to return a verdict of guilty if they found that the Commonwealth had proven beyond a reasonable doubt that the defendant had acted from a heat of passion even if they also found that he had used reasonable force in self-defense).

The supplemental instruction cannot be saved by the earlier definition of mitigating facts contained in the body of the charge for two reasons. First, the jury did not comprehend that definition and was undeniably confused as to the difference between murder and manslaughter. Second, the supplemental instruction would have altered the jury's

(18)

understanding of malice since the judge did not refer the jury back to his earlier instructions regarding mitigating factors. See Commonwealth v. Green, 55 Mass. App. Ct. 376, 382, 770 N.E.2d 995, 1000 (2002) (Better practice, although not reversible error in that case, to remind jury that supplemental instructions should be considered in conjunction with the main charge). In light of the jury's inability to distinguish murder from manslaughter, the supplemental instruction was wholly insufficient to adequately instruct the jury or to eliminate their confusion.

The definition of manslaughter in the supplemental instruction may also have prevented the jury from returning a verdict of manslaughter. According to that definition, the jury could find manslaughter only if they found that the defendant "intentionally killed Nelson Liriano." [Tr. 8/14]. If the jury found instead that the defendant's conduct created a "plain and strong likelihood that death would result" [Tr. 8/13], they were instructed to find the existence of malice sufficient to support a conviction of second degree murder. See Commonwealth v. Carlino, 429 Mass. 692, 695, 710 N.E.2d 967, 970 (1999) (New trial ordered where erroneous instruction

permitted jury to believe that excessive force in self-defense justified murder verdict). Thus, under the supplemental instruction, regardless whether the jury found that Cabrera used excessive force in self-defense or acted in sudden combat, if they found that he did not intend to kill Liriano, but also found that his use of the knife indicated a "plain and strong likelihood that death would result," they were to return a verdict of murder. The instruction to the jury – absent a description of the mitigating factors – created a substantial risk that they would conclude that because a weapon was used, there was malice.

Although a judge need not go beyond the scope of a jury's question and instruct on other issues, Commonwealth v. Amazeen, 375 Mass. 73, 82, 375 N.E.2d 693, 700 (1978), it is another matter to provide only a partial and misleading instruction in response to the jury instruction. The judge had the obligation to instruct on the mitigating factors that negate malice once the issue was raised. Commonwealth v. Harrington, 379 Mass. 446, 450, 399 N.E.2d 475, 479 (1980).

The supplemental jury instruction was also defective because it placed the burden of proof on the jury to prove the absence of excuse or justification,

rather than on the prosecution to disprove the absence of malice. The burden at all times is on the Commonwealth. <u>Francis v. Franklin</u>, 471 U.S. 307 (1985); <u>Sandstrom v. Montana</u>, 442 U.S. 510 (1979); <u>Mullaney v. Wilbur</u>, 421 U.S. 684; (1975); <u>Connolly v. Commonwealth</u>, 377 Mass. 527, 533-534, 387 N.E.2d 519 (1979).

> [T]he erroneous instruction, even if it followed instructions which correctly stated the burden of proof, "could only have misled" the jury . . . . [In] a case of murder in the second degree, where there was . . . a legitimate issue as to provocation, [there is doubt] that the error posed no substantial risk of a miscarriage of justice."

<u>Commonwealth v. Carlino</u>, 429 Mass. at 694-695, 710 N.E.2d at 970, citing <u>Commonwealth v. Acevedo</u> 427 Mass. 714, 715-716, 695 N.E.2d 1065 (1998).

In <u>Commonwealth v. Green</u>, <u>supra</u>, as in the present case, the jury was confused as to the difference between murder and manslaughter. The jury in <u>Green</u> specifically asked for "mitigating circumstances" whereas the jury in the instant case requested "the definition of malice for the voluntary manslaughter charge." [Tr. 8/10]. Regardless of the wording of the request, the information sought was the same. The judge in <u>Green</u> instructed the jury as to the mitigating factors whereas the judge in the

instant case did not. In the present case, where the mitigating factors are such an integral component of distinguishing murder from malice, the jury could have strictly adhered to the supplemental instruction and convicted the defendant of murder where the Commonwealth had not sufficiently proved the absence of malice. Thus, it can not be said that the failure to incorporate the factors that negated malice in the supplemental instruction did not pose a substantial risk of a miscarriage of justice.

The conviction of the defendant based upon faulty instructions violated due process and deprived him of a fair trial. Cabrera's conviction of murder violates his rights under the Fifth and Fourteenth Amendments to the Constitution of the United States and Article XII of the Massachusetts Declaration of Rights.

II.   **JOSE LUIS CABRERA'S MOTION FOR A REQUIRED FINDING OF NOT GUILTY SHOULD HAVE BEEN ALLOWED WHERE THE EVIDENCE DID NOT DEMONSTRATE A SUFFICIENT INTENT TO SUPPORT A CONVICTION FOR MURDER**

    A.   **A Motion For A Required Finding Of Not Guilty Should Be Allowed Where The Facts And Reasonable Inferences Drawn Therefrom Do Not Support A Finding Of Guilt Beyond A Reasonable Doubt**

The standard for evaluating a motion for a required finding of not guilty is "whether, after

viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Commonwealth v. Latimore, 378 Mass. 671, 677, 393 N.E.2d 370, 374 (1979), quoting Jackson v. Virginia, 443 U.S. 307, 318-319 (1979) (emphasis in original). In a case in which mitigating circumstances negating malice were present, the issue was "whether at the close of the Commonwealth's case there was sufficient evidence, viewed in the light most favorable to the Commonwealth, for the jury to conclude, beyond any reasonable doubt, that the defendant acted with malice." Commonwealth v. Ewing, 30 Mass. App. Ct. 285, 287, 567 N.E.2d 1262, 1264 (1991). In reviewing the denial of a motion for a required finding of not guilty in a criminal case the court should "consider whether 'the evidence is insufficient as a matter of law to sustain a conviction on the charge.'" Commonwealth v. Salemme, 395 Mass. 594, 595, 481 N.E.2d 471 (1985), quoting Mass. R. Crim. P. 25(a), 378 Mass. 896 (1979). The court should review only the evidence that was introduced in the Commonwealth's case-in-chief. Commonwealth v. Campbell, 375 Mass. 308, 311, 376

N.E.2d 872, 874 (1978). The motion for a required finding of not guilty should be allowed when all the circumstances including inferences that are not too remote, are not "of sufficient force to bring minds of ordinary intelligence and sagacity to the persuasion of [guilt] beyond a reasonable doubt." See Commonwealth v. Latimore, 378 Mass. 671, 676, 393 N.E.2d 370 (1979).

   **B.    The Prosecution Failed To Prove Beyond A
          Reasonable Doubt That The Defendant Acted
          With Malice And That The Killing Did Not
          Occur In The Heat Of Sudden Combat Or
          Excessive Use Of Force In Self-Defense.**

       Viewing the evidence in the light most favorable to the Commonwealth at the close of the Commonwealth's evidence, the jury could have found that:

1.    Liriano was angry with Cabrera prior to arriving at the party [Tr. 4/9-12, 19-22];

2.    At the time of the incident, Liriano, who had consumed alcohol before and during the party, was drunk [Tr. 2/217, 219-220; 5/185-186, 4/251, 5/15-16, 50];

3.    Liriano quarreled with Cabrera in the kitchen [Tr. 2/254, 258; 3/14-15; 6/54];

4.    Liriano called Cabrera a derogatory name in Spanish and a fight broke out between Liriano and Cabrera in the living room [Tr. 2/228-231];

5.    After the fight broke up, Cabrera walked away into the kitchen [Tr. 2/235];

6       Liriano pursued him into the kitchen and they met
        at the doorway. Liriano initiated the struggle
        [3/23, 25; 5/25, 30];

7       At some point, Liriano approached Cabrera at the
        refrigerator[29] [Tr. 3/22-26];

8.      Cabrera    stabbed    Liriano    several    times.
        Bloodstains were found on the refrigerator, the
        floor near the refrigerator, and the rear hallway
        [Tr. 2/244, 5/104, 111-112];

9.      Liriano left the apartment with others, went down
        the stairs and onto a neighbor's property [Tr.
        2/173, 245, 247; 4/160];

10.     The police found Liriano's body several hours
        later [Tr. 4/195];

11.     The autopsy report indicated that Liriano had some
        double-sided wounds that could not have been
        inflicted by the knife believed to be the murder
        weapon.[30] [Tr. 4/67, 118, 142].


        The evidence, when viewed in the light most
favorable to the Commonwealth, is consonant, not with
murder, but with voluntary manslaughter.

        Malice aforethought is a required element of

-----

[29] Although Rivera initially testified that Cabrera had
gone out to the second living room, she subsequently
recanted that testimony and stated that Liriano had
met Cabrera in the kitchen. Furthermore, blood was
found only in the kitchen and the rear hallway. [Tr.
2/260, 5/111-112].

[30] The evidence when viewed subsequent to the defendant
testifying presents an even stronger case for
manslaughter. It further indicates that **Liriano** was
the **aggressor**, that he assaulted Cabrera with broken
glass, that Cabrera was unable to leave the kitchen
before Liriano entered it, that Cabrera's heart was
beating rapidly and that he was motivated to act in
self-defense. [Tr. 6/68-71, 74, 78; 7/49-50]

second degree murder. Commonwealth v. Leate, 352 Mass. 452, 456-457, 225 N.E.2d 921, 924 (1967). Malice aforethought is defined as "any intent to inflict injury without legal excuse or palliation . . .", Commonwealth v. Colon-Cruz, 408 Mass. 553, 547, 562 N.E.2d 797 (1990), or any unexcused intent to kill, to do grievous bodily harm, or to do an act creating a plain and strong likelihood that death will follow. Commonwealth v. Grey, 399 Mass. 469, 505 N.E.2d 171 (1987).

Although malice may be inferred from the use of deadly weapon, this is not a mandatory presumption. See Commonwealth v. Jones, 366 Mass. 805, 809, 323 N.E.2d 726, 729 (1975). The knife in question was nothing more than a weapon of opportunity. There is no evidence that Cabrera brought a weapon to the scene, and indeed, Rivera testified that the knife found outside her house belonged to her. In the facts of this particular case, malice was not a reasonable inference from the use of a dangerous weapon where the evidence of sudden combat and excessive use of force in self-defense was overwhelming.

A jury can not find malice unless the Commonwealth proves beyond a reasonable doubt that

provocation is absent, since malice and adequate provocation are mutually exclusive. Commonwealth v. Boucher, 403 Mass. 659, 662, 532 N.E.2d 37, 39 (1989); See Commonwealth v. Acevedo, supra.

Additionally, the objective standard of whether an ordinary person would probably have been so provoked governs the determination of whether there has been adequate provocation justifying the defendant's actions. Commonwealth v. Anderson, 398 Mass. 838, 843, 501 N.E.2d 515, 518 (1986); Commonwealth v. Garabedian, 399 Mass. 304, 315, 503 N.E.2d 1290, 1297 (1987). Viewing the evidence in the light most favorable to the Commonwealth, the provocation throughout the party, followed by the physical fight and the effort to retreat, the Commonwealth's burden to prove malice simply has not been satisfied.

Manslaughter is the unlawful killing of a person without malice. Commonwealth v. McLeod, 394 Mass. 727, 738, 477 N.E.2d 972, 981 (1985), cert. denied 474 U.S. 919 (1985). Voluntary manslaughter is the intentional killing of a person from a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice or upon sudden combat or from the excessive use of force in self-defense. Commonwealth v.

Soaris, 275 Mass. 291, 299, 175 N.E.491, 493-494 (1931); Commonwealth v. Burbank, 388 Mass. 789, 795, 448 N.E.2d 735, 739 (1983). Because the evidence of mitigating circumstances in the present case was overwhelming, a required finding of not guilty should have been entered to so much of the charge as alleged murder (as opposed to manslaughter). Simply put, the evidence presented by the Commonwealth was insufficient to support a conviction for second degree murder.

Although mere evidence of provocation may be insufficient, as a matter of law, to mandate a required finding of not guilty on the malice issue, in the present case, there was insufficient evidence of the absence of provocation to send the issue of malice to the jury. Cf. Commonwealth v. Andrade, 422 Mass. 236, 237 661 N.E.2d 1308; 1310 (1996) (7 hour "cooling off" period between killing and provocation); Commonwealth v. Young, 35 Mass. App. Ct. 427, 435, 621 N.E.2d 1180, 1185 (1993) (Although victim swung a stick at one defendant, there was evidence that both defendants had prepared earlier for a gun assault on the victim). The use of a knife in self-defense or sudden combat which was obtained only during the fight should not be viewed as creating an inference of malice sufficient to automatically defeat a motion for

a required finding. Cf. Commonwealth v. Campbell, 375 Mass. 308, 313, 376 N.E.2d 872, 876 (1978). There should be evidence in addition to the use of a deadly weapon in order to take the matter outside the purview of judicial review and reflection. See Commonwealth v. Greene, 372 Mass. 517, 519, 522, 362 N.E.2d 910, 913 (1977) (Conviction sustained where "the great weight of the evidence does not tend to establish that the killing was carried out without malice aforethought").

> Thus, to sustain the denial of a directed verdict, it is not enough for the appellate court to find that there was some record evidence, however slight, to support each essential element of the offense; it must find that there was enough evidence that could have satisfied a rational trier of fact of each such element beyond a reasonable doubt.

Commonwealth v. Latimore, 378 Mass. at 677-8, 393 N.E.2d at 374-5.

The evidence presented by the Commonwealth clearly pointed to fact that Liriano was the aggressor. He had arrived at the party angry at a debt that he believed Cabrera owed him.[31]  He called Cabrera an obscene name. He pursued Cabrera into the kitchen after Cabrera had left the fight in the living room.

---

[31] The prosecution's witnesses testified that Liriano believed that he was owed money by Cabrera and was angry. [Tr. 4/9-12, 19-22, 222-223; 5/21, 144-145].

( 29 )

The fatal wounds are to the front of Liriano, which are consistent with an assault by Liriano, rather than attempt to avoid Cabrera. At least one of the purported "defensive" wounds was caused by a double edged instrument. This was inconsistent with the kitchen knife, alleged to be the murder weapon, but would be consistent with rolling over glass shards in the living room fight. As such, it could hardly be a "defensive" wound with regard to the kitchen fight. [Tr. 4/67, 118, 142]

There was no evidence of prior bad feelings on the part of Cabrera against Liriano. There was no evidence that Cabrera had formed an intent to attack Liriano. Indeed, the purported weapon was a knife belonging to the proprietor and not one carried to the scene by Cabrera. There was simply no evidence of a "conscious and fixed purpose to kill continuing for a length of time." Commonwealth v. Lamrini, 392 Mass. 427. 542, 467 N.E.2d 95, 98 (1983). The injuries inflicted upon Liriano were consistent with a quick fight that was motivated by fear and adrenaline.

The Commonwealth's case did deteriorate subsequent to the Commonwealth resting. Cf. Commonwealth v. Campbell, 375 Mass. at 311, 376 N.E.2d

( 30 )

at 875. The defendant took the witness stand and introduced significant evidence of self-defense and sudden combat. Although the jury was not required to believe this information, Commonwealth v. McInerney, 373 Mass. 136, 145, 365 N.E.2d 815, 821 (1977), it thrust the burden on the Commonwealth to rebut this evidence. Commonwealth v. Acevedo, supra.

The evidence clearly indicates that the killing was not one which occurred as a result of any plan or purpose, but which occurred by chance and under circumstances of sudden combat. Malice is negated and at most, the conduct constituted voluntary manslaughter, not murder. Commonwealth v. Peters, 372 Mass. 319, 324, 361 N.E.2d 1277, 1280 (1977).

This is not the situation where "the evidence, properly viewed in the light most favorable to the Commonwealth, permitted the jury to conclude that he . . . killed the victim in circumstances not justifying self-defense." Cf. Commonwealth v. Beauchamp, 49 Mass. App. Ct. 591, 609, 732 N.E.2d 311, 327 (2000). The totality of the circumstances dictated that Liriano's death was the result of sudden combat and/or the excessive use of force in self-defense.

The defendant's argument is not directed towards the weight and credibility of the evidence presented but rather, to the fact that the mitigating circumstances defeat the existence of malice. Additionally, this is not the case in which evidence of the mitigating circumstances arises out of the defendant's "self-serving" statements. See Commonwealth v. McInerney, 373 Mass. at 146, 365 N.E.2d at 821; Commonwealth v. Maillet, 400 Mass. 572, 580, 511 N.E.2d 529, 534 (1987) (No reversal where only evidence of victim's aggression came from defendant). Instead, the evidence of mitigating circumstances comes from events observed by the prosecution's witnesses and is an integral part of the prosecution's case.

The prosecution did not overcome its burden of proof by demonstrating the existence of malice. The conviction of murder is not consonant with justice. Therefore, Cabrera's motion for a required finding of not guilty to at least as much of the indictment as alleged murder should have been granted. Cabrera's conviction of murder violates his rights pursuant to the Fifth and Fourteenth Amendments to the

( 32 )

Constitution of the United States and Article XII of
the Massachusetts Declaration of Rights.

## III. DEFENSE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL

### A.  The Standard Of Review For Ineffective Assistance of Counsel

Trial counsel's performance is constitutionally
ineffective when it falls "measurably below that which
might be expected from an ordinary fallible lawyer"
and "likely deprive[s] the defendant of an otherwise
available, substantial ground of defence [sic]."
Commonwealth v. Saferian, 366 Mass. 89, 96, 315 N.E.2d
878, 883 (1974). In Commonwealth v. Amirault, 424
Mass. 618 n.24, 677 N.E.2d 652 (1997), the Supreme
Judicial Court analogized ineffective assistance of
counsel to a substantial risk of a miscarriage of
justice and acknowledged that "[I]t is possible that
[the Court is] somewhat readier to find ineffective
assistance of counsel, at least before the regular
processes of appeal have run their course, than has
been the Federal practice under Strickland v.
Washington, 466 U.S. 668 (1984). . . ."

In the instant case, defense counsel's "multiple
missteps, failures, and omissions fell outside the
'wide range of reasonable professional assistance'

( 33 )

guaranteed by the Sixth Amendment" and Article XII of the Massachusetts Declaration of Rights. <u>United States v. Correia</u>, No. 00-10246-RWZ, 2002 U.S. Dist. LEXIS 17218, at *3 (D. Mass. Sept. 13, 2002) (quoting <u>Strickland v. Washington</u>, 466 U.S. at 689). <u>See also</u> <u>Commonwealth v. Saferian</u>, 366 Mass. at 96, 315 N.E.2d at 883. The individual failings as well as the cumulative weight of the flaws in defense counsel's representation irreparably prejudiced the defendant. <u>See Pavel v. Hollins</u>, 261 F.3d 210, 225-226 (2d Cir. 2001). In cases such as the one sub judice, "the defense was so botched that judgments on [whether better work might have accomplished something material for the defense are] without value." <u>Commonwealth v. Satterfield</u>, 373 Mass. 109, 115, 364 N.E.2d 1260, 1264 (1977).

> **B. Defense Counsel Demonstrated Serious Incompetency, Inefficiency, Or Inattention Of Counsel Which Fell Measurably Below That Which Might Be Expected From An Ordinary Fallible Lawyer**
>
> > **1. Defense Counsel Failed To Object To the Consciousness of Guilt Instruction Which Permitted Evidence To Be Used To Find Malice**

The trial judge instructed the jury that evidence "regarding the flight of the defendant from the area of Lynn down to New York or Connecticut and also the use of aliases" could be treated as "one of the

factors tending to prove the guilt of the defendant."
[Tr. 7/148-149]. He told the jury twice more that they
could consider such evidence as a factor tending to
prove guilt. [Tr. 7/149-150]. Although consciousness
of guilt evidence might be relevant as to whether an
unlawful killing was committed, it "is not evidence of
malice aforethought." Commonwealth v. Niland, 45
Mass. App. Ct. 525, 529, 699 N.E.2d 1236, 1239 (1998);
Commonwealth v. Riley, 433 Mass. 266, 273, 741 N.E.2d
821, 824 (2001). Counsel failed to object to this
instruction. The jury could have been persuaded by
this additional evidence of guilt to find that the
Commonwealth had met its burden in proving malice. In
a case such as this, where there was a substantial
amount of evidence negating malice, this instruction
created a substantial risk of a miscarriage of
justice.

> **2.    Defense Counsel Failed To Object To A
> Supplemental Instruction On Malice,
> Thus Shifting The Burden Of Proof Onto
> The Defense**

As discussed infra, the supplemental instruction
on malice [Tr. 8/14] shifted the burden from the
Commonwealth to the defense to disprove the absence of
mitigating factors. Connolly v. Commonwealth, 377

Mass. 527, 533-534, 387 N.E.2d 519 (1979). Defense counsel's failure to object to this instruction in a case in which there was substantial evidence of mitigating factors resulted in a substantial risk of miscarriage of justice.

> **3.  Defense Counsel Failed To Raise the Issue Of The Victim's Reputation On Direct Examination Thus precluding Raising It On Re-Direct**

Where self-defense is raised as an issue, evidence tending to show that the victim had a **reputation for** being "violent or quarrelsome" is admissible, provided that there is evidence that the defendant knew of that reputation. Commonwealth v. Kamishlian, 21 Mass. App. Ct. 931, 933, 486 N.E.2d 743, 746 (1985), citing Commonwealth v. Dilone, 385 Mass. 281, 285, 431 N.E.2d 576, 579 (1982). See also Commonwealth v. Hennessey, 17 Mass. App. Ct. 160, 167, 456 N.E.2d 1146, 1150-51 (1983).

The scope of redirect examination can be limited to the scope of matters raised during cross examination, as the purpose of redirect is "to explain or rebut adverse testimony or inferences developed during cross-examination." Commonwealth v. Allen, 395 Mass. 448, 459, 480 N.E.2d 630, 638 (1985), quoting

Commonwealth v. Hoffer, 375 Mass. 369, 375, 377 N.E.2d 685 (1978).

Because defense counsel did not attempt to elicit the defendant's knowledge of the victim's reputation during direct examination, he risked the possibility that the trial judge would not allow him to address it on redirect examination. This is precisely what occurred. [Tr. 7/57]. As a result, defense counsel's failure to introduce evidence relevant to self-defense and absence of malice created a substantial risk of miscarriage of justice.

> **4. Defense Counsel Did Not Follow Up On The Medical Examiner's Testimony Regarding Inconsistencies Between The Alleged Murder Weapon And A Double-Sharp Edged Cut Found On The Victim**

On earlier cross examination, Dr. Belliveau testified that his "examination showed [that] a double-sharp edge[d]" instrument caused the wound to Liriano's arm. [Tr. 4/142]. Defense counsel failed to take advantage of Dr. Belliveau's testimony by asking him to admit that the wound to Liriano's arm could not have been caused by the alleged murder weapon, which was notably a *single*-sharp edged knife. By asking this additional question, defense counsel could have explicitly shown that the wound to Liriano's arm, several times referred to as a "defensive wound," could

( 37 )

NOT have been caused by the knife that Cabrera held during the fight, and thus was not evidence of Liriano defending himself. [Tr. 4/122, 124, 127, 132]. Additionally, defense counsel did not argue this discrepancy in his closing. [Tr. 7/97-111]. The fact that the "defense" wounds were not made by the alleged murder weapon, and thus, could not have been incurred by Liriano taking a defensive position in the kitchen, strengthened the self-defense / absence of malice claim. and should have been brought out by defense counsel.

### 6.    Defense Counsel Made Numerous Other Mistakes

Defense counsel initially did not appear to have a theory of the case. The case, from the onset, should have been tried as a self-defense case, without all of the peripheral arguments which could only have confused the jury. Defense counsel was surprised by many of the prosecutor's statements during his opening, which indicated that he had not interviewed the witnesses. [Tr. 1/120, 123-125, 128-138].

Defense counsel failed to object to the introduction of autopsy photos. See Commonwealth v. Bastarache, 382 Mass. 86, 106, 414 N.E.2d 984, 997 (1980). This deprived the defendant of the opportunity to have the judge consider whether the prejudicial

value of the photographs outweighed their probative
value. Defense counsel failed to object or move to
strike leading questions that gave the appearance of
the prosecutor testifying. [Tr. 3/79, 83-84, 85, 87-
88, 91]. Defense counsel failed to properly
authenticate and introduce evidence of a 2:10 AM
police dispatcher recording, which would have
challenged Rivera's credibility. [Tr. 4/16-8, 183,
188]. He further failed to inquire about a car injury
that might have affected Rivera's memory. [Tr. 3/32].
Defense counsel should have insisted that Rivera
testify through a translator, as her inconsistent
statements during testimony were later explained away
by the prosecutor as "examples of what happens when
you have two languages and you are now talking in what
is not your native tongue." [Tr. 7/118].

Even if viewed as isolated mistakes, it is
impossible to discount the impact of any one of these
particular failings. Certainly, "[t]aken together,
defense counsel's missteps likely had a significant
effect on the outcome of the trial." Commonwealth v.
Simmarano, 50 Mass. App. Ct. 312, 316, 737 N.E.2d 488,

---

32 At one point, Rivera testified that she thought that
inaccuracies" meant "better." [Tr. 3/77].

492 (2000). "[T]here exists a reasonable probability
that, but for counsel's unprofessional errors, the
result of the proceeding would have been different."
Kimmelman v. Morrison, 477 U.S. 365, 375 (1986).
Defense counsel's "failure to investigate and develop
the evidence which could have supported the
defendant's defense and which could have raised a
reasonable doubt in the minds of the jurors" deprived
the defendant of a fair trial. Commonwealth v. Farley,
432 Mass. at 157, 732 N.E.2d at 896. As such, the
defendant's conviction violates his rights under the
Sixth and Fourteenth Amendments to the Constitution of
the United States and Article XII of the Massachusetts
Declaration of Rights.

IV.  **THE PROSECUTOR UNFAIRLY BIASED THE JURY AGAINST
     CABRERA THROUGH NUMEROUS PROSECUTORIAL ERRORS**

    A.  **Massachusetts Has Established A Standard Of
         Review For Prosecutorial Error**

The consequences of prosecutorial error depend on
a number of factors: (a) whether the defendant timely
objected to the argument; (b) whether the prosecutor's
error was limited to a collateral issue or whether it
impacted the essence of the case; (c) whether the
judge provided mitigating instructions to the jury;
and (d) whether the error could have possibly made a

(40)

difference to the jury. Commonwealth v. Kozec, 399 Mass. 514, 518, 505 N.E.2d 519, 521-522 (1987). This court must consider "whether the argument as a whole is prejudicial in light of all the circumstances, including the nature of the evidence, the persistence or flagrancy of the remarks, and the instructions of the judge." Commonwealth v. Clary, 388 Mass. 583, 590-591, 447 N.E.2d 1217, 1221 (1983) (citations omitted).

**B.    The Prosecutor Committed Prejudicial Error By Arguing Facts Not In Evidence**

Because defendants have a fundamental right to a fair trial, prosecutors must refrain from making improper or prejudicial remarks to a jury in an opening or in summation. Commonwealth v. DeCicco, 51 Mass. App. Ct. 159, 161, 744 N.E.2d 95, 97 (2001). As a general rule, the prosecutor may state in his opening anything that he expects to be able to prove by evidence. See Commonwealth v. Fazio, 375 Mass. 451, 454 378 N.E.2d 648, 650-51, (1978). However,

> [A] statement should never [be] included in the opening unless there [is] no doubt of its admissibility. Having been made, although never proved, it [is] irretrievably and fatally prejudicial to the defendant in the circumstances, and especially so when the prosecutor in his closing argument repeatedly assert[s a theory consistent with the inadmissible statement].

( 41 )

Commonwealth v. Bearse, 358 Mass. 481, 487, 265 N.E.2d 496, 499 (1970).

In the present case, the prosecutor presented facts in his opening and closing arguments that were never supported by admissible testimony at trial, including Mercado's observation — later found to be a mere assumption not based upon actual observation — that Cabrera took a knife from the pantry sink. These and other statements were objected to by defense counsel.[32] [Tr. 1/131-132].

One such fact not in evidence included Mercado's prior observation[33] that he actually saw Cabrera grab the knife from the pantry sink. Despite Mercado's admission that he merely assumed but did not see Cabrera grab the knife [Tr. 5/34], the prosecutor reiterated Mercado's earlier, discredited observation during his closing argument. [Tr. 7/119].

---

[32] The judge refused to strike the testimony or grant the defendant's motion for a mistrial [Tr. 7/128-133], despite defense counsel's argument that the prosecutor, by reiterating Mercado's prior statement, was in effect "endors[ing] the credibility of that statement which he knows has been disavowed by that witness more than once." [Tr. 7/132].

[33] The referenced observation of the knife was recorded in a 1990 police statement. [Tr. 5/32]. The prosecutor introduced the 1990 statement as a prior inconsistent statement to rehabilitate Mercado. [Tr. 5/65]. Defense counsel objected to the introduction at that time. [Tr. 5/63].

(42)

In an effort to support Mercado's discredited testimony that Cabrera washed the knife, the prosecutor stated that his forensic scientist, Zambella, testified that the knife should have had blood on it. [Tr. 7/126]. In actuality, the forensic scientist did not testify as to whether there should have been blood on the knife.    [Tr. 5/103-133]. Rather, Zambella testified that his memory of the knife that he had examined was "inconsistent" with the knife alleged to be the murder weapon. [Tr. 3/90; 5/113].

Additionally, the prosecutor misrepresented Dr. Belliveau's testimony, saying that Mr. Liriano was not drunk. [Tr. 7/118]. In actuality, that was not the testimony of Dr. Belliveau. [Tr. 4/104].

Defense counsel objected to the prosecutor's misstatement of facts and unsuccessfully moved for a mistrial.

In an attempt to explain inconsistencies between 1990 police reports and the 1999 testimony of the same witnesses, the prosecutor spoke on behalf of such witnesses when he proclaimed:

> I still have pretty good memories. Some of these memories may even now be wrong because eleven years has [sic] gone by. Why has [sic] eleven years gone by?    Because Jose

> took off. What I said this morning was
> correct, and you heard it read to you. You
> saw her on the stand.

[Tr. 7/117]. This statement unfairly inflamed the jury

against the defendant. Additionally, it was unfair

because it failed to also acknowledge that the delay

was due to the prosecution's failure to indict for

nine years. [R.A. 6].

During his closing arguments, the prosecutor said

that Maria Rivera admitted running an after hours

business [Tr. 7/116]. However, her testimony that she

did not do so was in direct conflict with the other

witnesses' testimony and affected her credibility. [Tr.

2/173-174, 205; 5/165, 174]. There was no objection by

the defense counsel.

During his closing argument, the prosecutor

attempted to inflame the jury by asking them to

> Imagine in your mind what it must feel like
> to drive a knife into a chest and sever a
> rib.    Imagine what it must feel like to
> skewer a heart.

[Tr. 7/120]. Not only were these statements calculated

to inflame the jury, but they had the additional effect

of encouraging the jury to put themselves in the place

of the victim.    See Commonwealth v. Sevieri, 21 Mass.

App. Ct. 745, 490 N.E.2d. 481, 486-87 (1986).

### C.    The Cumulative Effect Of The Prosecutor's Errors Requires Reversal

Although the prosecutor told jury that his memory

( 44 )

was not controlling, and the judge advised the jury that arguments were not evidence, this was insufficient to cure the harm. The prosecutor's misstatements of evidence and vouching for witnesses on a close case could only have had a detrimental cumulative effect. See Commonwealth v. Smith, 387 Mass. 900, 912, 444 N.E.2d 374, 382-383 (1983)(cumulative effect of prosecutorial errors requires reversal). The cumulative effect of the prosecutorial errors deprived the defendant of due process and a fair trial in violation of his rights under the Fifth and Fourteenth Amendments to the Constitution of the United States, and Article XII of the Massachusetts Declaration of Rights.          ·

**V.   THE COURT COMMITTED REVERSIBLE ERROR BY REFUSING TO PERMIT DEFENSE COUNSEL TO INQUIRE AS TO CABRERA'S KNOWLEDGE OF LIRIANO'S REPUTATION**

In cross-examination, Cabrera made reference to Liriano's personality when he had been drinking. [Tr. 7/23]. Notwithstanding, the Court refused to permit defense counsel to further inquire as to Liriano's reputation, stating that it was beyond the scope of redirect. [Tr. 7/57]. This constituted an abuse of discretion.

Despite the fact that evidence of knowledge of

(45)

reputation was relevant to the issue of self-defense and absence of malice, the issue of reputation had not been raised during direct examination. Clearly, this was an oversight on the part of trial counsel. The trial court should have realized that this "failure to ask specific questions concerning the [issue] in the course of direct examination had resulted from oversight" and should have permitted the line of questioning. See Commonwealth v. Sims, 7 Mass. App. Ct. 881, 882, 386 N.E.2d 804, 805 (1979). Furthermore, the court should have concluded that the defendant's right to present a defense merited the allowance of questions outside the scope of cross-examination. See Commonwealth v. Allen, 395 Mass. 448, 459, 480 N.E.2d 630, 638 (1985).

Regardless, the information sought by defense counsel fell within the scope of redirect examination because it had been raised on cross-examination. Thus, it was a permissible topic for redirect examination. Id. The exclusion of such testimony, particularly in light of its relevance to the defense, constituted an abuse of discretion and violated the defendant's right to a fair trial under the Fifth and Fourteenth Amendments to the Constitution of the United States

(46)

(47)

## CONCLUSION

For the above said reasons, this court should grant the petitioner petition for Writ of Habeas Corpus, and vacate life sentence and remand the case to Superior Court for New Trial , in accordance with this holding. Alternatively, this court should grant any other relief that is appropriate.

DATE 5/25/005

RESPECTFULLY SUBMITTED
*Jose L Cabrera S.*
MR.JOSE LUIS CABRERA
N.C.C.I.GARDNER
P.O.BOX 466
500 COLONY RD.
GARDNER MASS.01440

**VERIFICATION**

I declare under the pains penalties of perjury that I have read the foregoing petition and that the facts stated therein are true to the best of my knowledge, information and belief.

Subscribed in Worcester County Massachusetts, this 25 day of May 2005:

*Jose Luis Cabrera S.*
MR.JOSE LUIS CABRERA
N.C.C.I.GARDNER
P.O.BOX 466
500 COLONY RD.
GARDNER MASS.01440

(47)

**ADDENDUM**

**UNITED STATES CONSTITUTION**

**FIFTH AMENDMENT**

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

**FOURTEENTH AMENDMENT**

Section 1.   All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.   No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

## MASSACHUSETTS DECLARATION OF RIGHTS

### ARTICLE XII

No subject shall be held to answer for any crimes or offence, until the same is fully and plainly, substantially and formally, described to him; or be compelled to accuse, or furnish evidence against himself. And every subject shall have a right to produce all proofs, that may be favorable to him; to meet the witnesses against him face to face, and to be fully heard in his defense by himself, or his counsel, at his election. And no subject shall be arrested, imprisoned, despoiled, or deprived of his property, immunities, or privileges, put out of the protection of the law, exiled, or deprived of his life, liberty, or estate, but by the judgment of his peers, or the law of the land.

And the legislature shall not make any law, that shall subject any person to a capital or infamous punishment, excepting for the government of the army and navy, without trial by jury.

INMATE'S ACCOUNT'S TREASURY
DEPARTMENT OF CORRECTION
N.C.C.I.GARDNER
P.O.BOX 466
500 COLONY RD.
GARDNER MASS.


JOSE LUIS CABRERA
N.C.C.I.GARDNER
P.O.BOX 466
500 COLONY RD.
GARDNER MASS.01440


IN RE:<u>INMATE STATE PRISONER REQUEST FOR $5.00 CHECK TO BE ISSUES</u>
<u>FOR FILING FEES OF HIS WRIT OF HABEAS COPRUS PURSUANT TO</u>
<u>28 U.S.C.2254 and 2255;</u>


Dear Treasury;

Please place a check in the mount of $5.00 from my
inmates account ,for filing fees pursuant to 28 U.S.C.2254 and
2255,Writ of Habeas CORPUS Unlawful Restraint,which is attached
herewith,and other supporting documents,which are to be sent
to the United States District COurt of Worcester. The name on the
Check must be made out to Martin.Castles at 595 Main St.Worcester
Mass.01608,which he is the clerk of court.

Further after placing check of $5.00 in envelope,please
seal and mail it to the said address stated on the envelope.


MAY 2-5 2005          PRO-SE          SINCERELY YOURS
                                      Jose L Cabrera
                                      MR.JOSE LUIS CABRERA
                                      N.C.C.I.GARDNER
                                      P.O.BOX 466
                                      GARDNER MASS.01440